NATCHITOCHES PARISH HOSPITAL SERVICE DISTRICT and J.M. Smith Corp. d/b/a Smith Drug Co., on behalf of itself and others situated, Plaintiffs,

v.

TYCO INTERNATIONAL, LTD.; Tyco International (U.S.), Inc.; Tyco Healthcare Group, L.P.; and The Kendall Healthcare Products Company, Defendant.

Civil Action No. 05–12024 PBS.

United States District Court, D. Massachusetts.

Jan. 29, 2008.

Daniel Berger, Eric L. Cramer, David F. Sorensen, Keith J. Verrier, Berger & Montague, P.C., Philadelphia, PA, Brett Cebulash, Bruce E. Gerstein, Noah Silverman, Archana Tamoshunas, Garwin Gerstein & Fisher LLP, New York, NY, Stuart E. Des Roches, Andrew Kelly, John Alden Meade, Odom & Des Roches, LLP, New Orleans, LA, W. Ross Foote, David C. Raphael, Jr., David P. Smith, Percy, Smith, & Foote, LLP, Alexandria, LA, Adam M. Moskowitz, Thomas A. Tucker Ronzetti, Kozyak Tropin & Throckmorton, P.A., Miami, FL, Adam M. Stewart, Shapiro Haber & Urmy LLP, Boston, MA, for Plaintiffs.

Margaret Branick–Abilla, Linda F. Callison, Cooley Godward LLP, Palo Alto, CA, James Donato, Cooley Godward Kronish LLP, Christopher D. Dusseault, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, John M. Griffin, Marc A. Polk, Tyco Healthcare Group, LP, Mansfield, MA, Thomas M. Jeon, Cooley Godward Kronish LLP, Washington, DC, for Defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

In this proposed nationwide class action, Plaintiffs allege that defendant Tyco [1] engaged, and continues to engage, in anticompetitive conduct to foreclose competition in the United States market for sharps containers. Sharps containers are products or systems used to dispose of needle-inclusive biohazard products such as syringes, blood collection devices, and IVs. Tyco manufactures disposable sharps containers, and its and its containers comprised approximately 70% of the sharps containers sold in the United States during the proposed class period. Plaintiffs claim that Tyco violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, because Tyco used its market share to impede competition from other firms that produce both disposable and reusable sharps containers. Plaintiffs allege that Tyco's anticompetitive practices allowed it to maintain supra-competitive prices for its sharps containers without any pro-competitive justification. Plaintiffs seek treble damages under Section 4 of the Clayton Act for the overcharges that resulted from Tyco's anticompetitive scheme. See 15 U.S.C. § 15.

Specifically, Plaintiffs allege that Tyco violated the antitrust laws by: (1) imposing market share purchase requirements tied to maintaining or increasing Tyco's market share; (2) bundling its products for exclusionary purposes; (3) entering into exclusionary contracts with Group Purchasing Organizations ("GPOs"), which negotiate contracts on behalf of large groups of hospitals and similar entities; and (4) conspiring with other manufacturers to impose rebate penalties on purchasers relating to a bundle of Tyco and non-Tyco products.

Plaintiffs seek to certify a nationwide class of all direct purchasers who have purchased sharps containers from Tyco during the proposed class period. The proposed class period is from October 4, 2001 through the present. The proposed class of direct purchasers includes end users of Tyco's sharps containers and distributors that purchased sharps containers for resale.

Tyco contends that Plaintiffs' claims are not suitable for class treatment under Fed. R.Civ.P. 23 because the proposed class representatives, Natchitoches Parish Hospital Service District ("Natchitoches"), a hospital and sharps container end user, and J.M. Smith Corp. ("Smith Drug"), a sharps container distributor, cannot adequately represent a class that contains distributors that, on net, economically benefitted, and continue to benefit, from Tyco's allegedly anticompetitive scheme. Tyco also contends that Plaintiffs have no viable method for establishing an antitrust violation and resulting injury on a classwide basis, and thus Plaintiffs do not satisfy the requirement under Rule 23(b)(3) that issues common to the class predominate over individual issues unique to each class member.

After hearings and a review of the briefs and the extensive record, the Court finds that Plaintiffs have met the requirements of Fed.R.Civ.P. 23(a), but defers ruling on Plaintiffs' motion to certify (Docket No. 52) until it reviews the final expert reports to determine whether Plaintiffs have established predominance under Fed.R.Civ.P. 23(b)(3).

### I. THE PROPOSED CLASS

Plaintiffs propose to certify a class comprising:

All persons who purchased Sharps Containers in the United States directly from Tyco at any time during the period October 4, 2001 through the present (and continuing until the effects of Tyco's anti-

1. Defendants are Tyco International, Ltd., Tyco International (U.S.), Inc., Tyco Healthcare Group, L.P. (now Covidien), and The Kendall Healthcare Products Company (collectively, "Tyco").

competitive conduct cease) (the "Class Period"). The Class excludes Tyco, Tyco's parents, subsidiaries and affiliates. (Compl. ¶ 16). By definition, the proposed class contains only direct purchasers of Tyco's sharps containers in the relevant market during the proposed class period, and thus all class members have standing to assert claims for damages under the Clayton Act. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 728–29, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

## II.  *FACTUAL BACKGROUND*

The facts set forth below are drawn largely from the Complaint and are presumed true for purposes of ruling on this motion. The Court also relies on expert reports and other affidavits submitted by both parties. Many of the facts are hotly disputed.

### A.  THE MARKET

#### 1.  *Sharps Containers*

Sharps containers are used for the disposal of "sharps," which are needle-inclusive biohazard medical products such as syringes, blood collection devices, and IVs. Hospitals and other healthcare providers use sharps containers to prevent accidental needle-stick injuries. Needle-stick injuries, which number in the hundreds of thousands annually in the United States, put healthcare workers at risk of diseases such as hepatitis C and AIDS.

Generally, sharps containers are either sold as disposable products for one time use, or provided as reusable products as part of a waste disposal service, such as the "Daniels Sharpsmart Solution," a reusable service developed by sharps container supplier Daniels Sharpsmart ("Daniels"). Defendant Tyco manufactures and markets disposable sharps containers through its subsidiary Kendall Healthcare Products Company ("Kendall").

#### 2.  *Direct Purchasers*

For the most part, disposable sharps containers are sold to two different types of direct purchasers: end users and distributors. End users include acute care facilities such as hospitals; alternative site health care providers such as nursing homes, dentists' offices, labs, and veterinary clinics; various governmental entities; and research laboratories. In some instances end users purchase disposable sharps containers directly from the manufacturer. The purchase can be made either pursuant to a price negotiated by a Group Purchasing Organization or to a price negotiated directly by the hospital, a hospital chain, or a hospital network.

In most instances, however, disposable sharps containers are purchased by distributors for resale to end users. Distributors purchased approximately 88% (in terms of dollars purchased) of all of Tyco's sharps containers during the class period. In fact, during the class period, three distributors— Cardinal, Owens & Minor, and McKesson— accounted for approximately 59% of all of Tyco's sharps containers purchases. Tyco does not have an exclusive contract with any distributor.

#### 3.  *GPOs*

Many end users, such as hospitals and other health-care entities, rely upon Group Purchasing Organizations ("GPOs") to negotiate medical supply pricing and evaluate products. Approximately 68% to 98% of hospitals in the United States belong to at least one GPO. Due to consolidation in the mid–1990s, a handful of large GPOs dominate the market. Major GPOs include Broadlane, Novation, Consorta, HPG, Amerinet, Premier, and MedAssets.

GPOs are organizations that negotiate standardized contracts with manufacturers and suppliers of medical devices on behalf of their members. GPOs pool the purchasing power of their members and leverage that power to negotiate lower prices. GPOs do not *purchase* any products, nor do they *sign* or otherwise enter into the contracts that they negotiate on behalf of their members. Instead, GPOs negotiate standard form, or model, contracts that the members themselves sign and enter into with manufacturers. In addition, GPOs independently evaluate medical devices sold by manufacturers to provide the best products for their members. Thus, GPOs provide brokerage services for

the sale of medical supplies from manufacturers to the GPOs' members.

Due to amendments made to the "anti-kickback" provisions of the Social Security Act in 1986, manufacturers are permitted to pay the administrative fees of GPOs up to a specified percentage of sales made. As a result, GPOs are financed by the same manufacturers, including Tyco, that GPOs are supposed to negotiate with at arm's length and evaluate independently.

Not all end users of sharps containers utilize GPOs to negotiate pricing and contracting. Larger hospitals and hospital chains tend to negotiate contracts directly with manufacturers. Other hospitals belong to "Integrated Delivery Networks" ("IDNs") or "Integrated Hospital Networks" ("IHNs") that negotiate prices and terms with manufacturers and suppliers. Most non-acute care, alternative site facilities, such as nursing homes and dentists' offices, do not rely upon GPOs. Tyco contends that over 40% of the Kendall sharp container sales during the class period were outside of GPO contracts.

Significantly, distributors (as opposed to end users) purchase sharps containers from Tyco at volume-based list prices. Distributors earn revenue based on a distribution fee negotiated either directly with the end user, or by a contract between the distributor and a GPO. The distribution fee is generally derived on a "cost-plus" basis, or based on a percentage markup over the product's purchase price. For example, two of the three major distributors of sharps containers—Owens & Minor and McKesson—sell sharps containers on a cost-plus basis. There is some evidence that Cardinal also operates on a cost-plus basis.

If a distributor resells a sharps container to a customer that has negotiated a lower price—either directly or through a GPO—the distributor sells the container at that lower price, plus a distribution fee. The distributor then receives a "credit" from Tyco equal to the difference between the distributor list price and the lower customer price.

### 4. *Reusable Sharps Containers*

Reusable sharps containers, in contrast, are generally sold *directly* to end users as part of an overall waste disposal service or system. As a result, reusable sharps container manufacturers tend not to sell to distributors for resale. For example, Stericycle/Biosystems and SureWay, both reusable sharps containers suppliers, do not have any contracts with distributors with respect to their reusable sharps containers. Likewise two of the three largest distributors of Tyco's disposable sharps containers, Owens & Minor and McKesson, do not have any contracts to sell or distribute reusable sharps containers.

There is some evidence, however, that manufacturers of reusable sharps containers sometimes use distributors. At least one of the three largest distributors, Cardinal, entered into an agreement to serve as marketing, sales, and billing agent for Daniels in connection with its Daniels Sharpsmart System. In addition, Tyco itself explored a relationship with Owens & Minor to provide distribution services for Tyco's StarServe program, Tyco's nascent reusable sharps containers business.

### B. TYCO'S SCHEME TO FORECLOSE THE MARKET

#### 1. *Tyco Dominates the Market*

Beginning in the mid–1990s, hospitals had a sharp increase in their use of sharps containers due to a growing awareness of the dangers of sharps. This awareness spurred efforts to pass safety legislation to either mandate or encourage the use of sharps containers.

During the mid-to-late 1990s various firms, including Tyco, manufactured sharps containers. Alert to pending safety legislation regarding needle-stick injuries, Tyco began to acquire other sharps container manufacturers. For example, on November 2, 1998, Tyco acquired Graphic Controls Corp, and two years later, on May 5, 2000, Tyco acquired the sharps container product line of rival Sage. Tyco's acquisition of the Graphic Controls and Sage sharps container product lines allowed Tyco to assume Graphic Controls' and Sage's previous exclusionary contracts with large GPOs.

On November 6, 2000, President Clinton signed the Needlestick Safety and Prevention Act, which modified the Bloodborne Pa-

thogens Standard, 29 C.F.R.1910.1030. Among other things, the Act directed hospitals and other employers with workers occupationally exposed to bloodborne pathogens to consider and use effective engineering controls, including safer medical devices such as sharps containers, to reduce the risk of injury from needle-sticks and other sharp medical instruments. Plaintiffs allege that these changes became effective on April 12, 2001.

By the time the Act became effective Tyco had amassed a significant share of the sharps container market, although the parties disagree on the precise percentage. Since October 4, 2001, the start of the class period, Plaintiffs claim Tyco has had a 70% or more share in the sharps container market in the United States. Tyco claims that in the last quarter of 2005 Kendall had a 57% U.S. market share for sharps containers, Becton Dickinson, a rival, had 20%, and reusable manufacturers Stericycle and Daniels had 14% and 4% respectively. Plaintiffs' expert Prof. Einer Elhauge states that Tyco had a market share of 81–85% in acute care facilities and 58–73% overall based on his preliminary document review. (Elhauge Decl. ¶ 27).

Plaintiffs contend that Tyco obtained its market share largely at the expense of rivals who provided reusable sharps containers. For example, Tyco rival Daniels received FDA approval for a sharps container system, Daniels Sharpsmart Solution, that provides reusable containers and utilizes an automatic robotic decanting and sanitization process called "Washsmart." Daniels began marketing its system in the United States in 2000. Daniels claims that its system reduces needlestick injuries at or below Tyco's prices. Plaintiffs cite one study that found that the Daniels Sharpsmart Solution reduced container related sharps injuries ("CRSI") by approximately 87% for the hospitals that participated in the study, although the lead author of the article worked for Daniels at the time. (Compl. ¶ 32 (citing Grimmond T. et al., Sharps Injury Reduction Using Sharpsmart—A Reusable Sharps Management System, 54 *J. Hosp. Infection* 232 (2003))). Despite the effectiveness of its system, Daniels has only obtained a 2% share in the United States market. In contrast, Daniels has obtained 30% to 80% market shares in other countries such as Australia, New Zealand, Great Britain (UK), and Canada.

### 2. *Foreclosed*

Plaintiffs assert that Tyco substantially foreclosed competition by:

1. imposing market share purchase requirements tied to maintaining or increasing Tyco's market share;

2. bundling Tyco products for exclusionary purposes;

3. entering into exclusionary contracts with GPOs; and

4. conspiring with other manufacturers to impose rebate penalties on purchasers relating to a bundle of Tyco and non-Tyco products.

Plaintiffs allege that the above practices support two separate and independent theories of market foreclosure. Plaintiffs allege that the first, second, and fourth practices—market share purchase requirements and bundling—foreclosed the sharps containers end user market from rival competition. Plaintiffs allege that the third practice—GPO exclusionary contracts—foreclosed the GPO brokerage services market in sharps containers from rival competition. (Elhauge Decl. ¶ 14; Elhauge Reply Decl. ¶ 2(c)).

Plaintiffs maintain that Tyco's sharp practices, either alone or in combination, allowed Tyco to impose supra-competitive prices for its sharps containers without any pro-competitive justification.

#### i. Market Share Purchase Requirements

Tyco's scheme to foreclose the sharps container market included entering into contracts with purchaser end users—either directly or brokered by GPOs—that contained market share purchase requirements. Unlike volume-based purchase requirements, which are based on the amount purchased by an end user regardless of the amount purchased from rivals, market share purchase requirements are based on the amount end users purchase from Tyco *to the exclusion* of Tyco's rivals. Plaintiffs further allege that Tyco used its payment of administrative fees and other payments to GPOs to induce GPOs

to put such requirements in their model contracts.

For example, in some contracts, Tyco required purchasers to commit to buying a specific percentage of all of their sharps containers needs from Tyco in order to get the best pricing. One such contract negotiated between Tyco and Premier required Premier's members to purchase at least 90% of their "PRODUCT REQUIREMENTS ... PER CALENDAR YEAR," along with other volume-based commitments, to receive the best pricing. (*See* Elhauge Decl. ¶ 36 n. 45 Ex. 11 at TYN0001092). Another contract between Tyco and Consorta required members to have "90% compliance" and sign a "Letter of Commitment" to qualify for "Level II Committed pricing." (*Id.* Ex. 17 at TYN0020360).

Tyco also penalized purchaser end users who failed to meet its market share purchase requirements. A January 2001 agreement negotiated between Tyco and Novation, a GPO, imposed substantial penalty prices should Novation's members fail to buy 80% to 90% of their sharps containers from Tyco. Other penalties imposed by Tyco for failing to meet market share purchase requirements included both (1) not paying rebates for sharps containers already purchased, and (2) forcing a purchaser to pay back past rebates already received from past container purchases. Tyco's contracts, in fact, generally required end user purchasers to forfeit and repay *all* rebates on sharps containers already purchased should an end user decide not to meet Tyco's requirements.

Tyco monitored its market share purchase requirements. For example, under the January 2001 agreement Tyco negotiated with Novation, Tyco's sales representatives reviewed member purchases to determine each member's market share level and eligibility for associated discounts. The agreement also required Novation members to disclose their sharps container purchases to Tyco for review.

Tyco's market share purchase requirements significantly deterred end user purchasers from purchasing sharps containers from any other manufacturer but Tyco. Because Tyco employed market share purchase requirements with some, if not all, of the contracts it negotiated with GPOs, Plaintiffs contend these requirements had the effect of significantly foreclosing the sharps containers market from competition.

### ii. Bundling Tyco Products for Exclusionary Purposes

In conjunction with its market share purchase requirements, Tyco also foreclosed the sharps containers market by bundling its sharps containers with other Tyco products. Under such bundling arrangements Tyco tied rebates to meeting market share requirements on *each and every* product within the bundle. A purchaser would lose rebates for all products in the bundle should the purchaser fail to maintain market share purchase requirements for any one bundled product. Tyco contends that approximately 15% of Kendall sales were made through these bundling programs, and that bundling stopped entirely in mid–2005.

For example, Tyco instituted with Novation a "Tyco Enhancement Program" that bundled discounts on sharps containers with products relating to incontinence, wound care, pulse oximetry, and electrodes, among other products. Tyco also bundled its sharps containers with its needles and syringes.

Many of Tyco's rivals were smaller firms that could not offer the same range of products that Tyco offers. Consequently, in many instances Tyco's rivals could not offer offsetting or greater discounts to compensate for all of the rebates an end user would lose by switching to the rival.

### iii. GPO Exclusionary Contracts

Tyco also allegedly foreclosed the sharps containers market by entering into sole-source or dual-source contracts with GPOs. Under these contracts, made between Tyco and the GPO *itself*, the GPO agreed to broker only sharps containers from Tyco (or Tyco and one other rival) to its members. These sole-source and dual-source contracts were the result of a competitive bidding process in which GPOs would award such contracts based upon proposals submitted by sharps containers manufacturers. Tyco, however, used its payments of administrative fees and other payments to induce GPOs to

enter into such multi-year agreements with Tyco.

A 2003 internal document showed that, at the time, Tyco had either sole-source or dual-source contracts with six of the seven major GPOs:

| | |
|---|---|
| Novation: | Sole Source |
| Consorta: | Sole Source |
| HPG: | Sole Source |
| AmeriNet: | Sole Source |
| Premier: | Dual Source |
| MedAssets: | Dual Source |

(Elhauge Decl. ¶ 35 n. 42, Ex. 2 at TYN0009139).

These sole-source and dual-source contracts, coupled with the internal policies and practices of the GPOs, coerced GPO members to enter into exclusionary contracts with Tyco that included market share purchase requirements and bundling. For example, Premier has adopted a general policy of commitment that requires its members to sign a letter of intent to comply with any commitment contracts that Premier negotiates with suppliers. Any member who refuses to sign the letter of intent risks expulsion from Premier and lost rebates from other products. Other GPOs have similar coercive policies.

Tyco's sole-source and dual-source contracts with GPOs discouraged members from purchasing sharps containers from Tyco's non-GPO-approved rivals. The result was to foreclose other sharps containers manufacturers from selling their products to GPO members.

#### iv. Conspiracy with Manufacturers to Impose Rebate Penalties

Finally, Tyco foreclosed the sharps containers market by conspiring with the manufacturers of other medical device products to assist each other in foreclosing rivals. The conspiracy involved various GPO programs, and utilized the same bundling tactics Tyco used with its own products. In essence, a GPO member would lose rebates for *other manufacturers'* products purchased should it fail to maintain market share purchase requirements for Tyco's sharps containers. GPO members would not only lose rebates from present and future purchases, but in some instances be forced to pay back past rebates already received from other manufacturers.

For example, Tyco participated in Novation's Opportunity/Spectrum I and Opportunity/Spectrum III portfolio purchasing programs. Both programs conditioned rebates for Novation's members on meeting purchase requirements for a portfolio of Tyco and non-Tyco products. Specifically, the "TERMS OF SUPPLIER'S PARTICIPATION IN OPPORTUNITY® COMMITTED PORTFOLIO" provide that "[o]ne criteria that must be satisfied by [the Novation member] for payment of Incentives is the criteria that the [member] has purchased at least ninety-five percent (95%) of its projected purchase volume for Supplier's Portfolio Categories." (*See* Elhauge Decl. ¶ 36 n. 46 Ex. 18 at TYN0001040). To participate in the program, Tyco paid, among other things, an additional fee totaling 7% of all sales revenue received from the member hospitals.

The Opportunity/Spectrum programs, moreover, penalized members who evaluated rival products. Under the program Novation members that perform evaluations of competitive products may lose the Novation discounts within 30 days of the start of the evaluation. Penalties in the form of loss of past, present, and future rebates applied.

The effect of the conspiracy, as with Tyco's other alleged anticompetitive practices, was to substantially foreclose the sharps containers to Tyco's rivals. The alleged conspiracy discouraged member hospitals from purchasing sharps containers from rivals or risk losing significant rebates. The conspiracy also made it economically challenging for smaller rivals to provide offsetting discounts and rebates to compete with Tyco.

#### 3. *The Anticompetitive Effect of Tyco's Alleged Scheme*

Plaintiffs claim that Tyco engaged in its scheme with the intent of substantially shutting its rivals out of the market. One internal e-mail concerning the threat of reusables put the intent of Tyco's scheme bluntly: to prepare for "Stericycle/BioSystems national 'Reusable' attack," Tyco must "[m]ake it a priority to negotiate maintenance and/or growth clauses in every GPO/IDN agreement upon renewal" and "[i]nclude additional non-published value price tiers that stipulate

[that] disposable sharps must be used for eligibility." (Elhauge Decl. ¶ 37 n. 49 Ex. 24 at TYN0004234). Plaintiffs allege that Tyco's scheme, in whole or in part, had the effect of creating artificial barriers to entry that substantially foreclosed and/or impaired competition (and the threat of such competition) from lower-priced and/or superior quality sharps containers. Absent Tyco's scheme, both potential and actual rivals would have:

1. Obtained greater sales by offering cheaper and/or superior products;

2. Achieved lower costs by having access to the most efficient sources of inputs or distribution, such as the GPO brokerage services market; and

3. Acquired a greater share of the market as a result and achieved greater economies of scale, scope, innovation, and learning—what can be called economies based on market share, or *economies of share*—that would have further lowered the costs and prices of their sharps containers.

(*See* Elhauge Decl. ¶ 29). With its scheme, Tyco punctured potential or actual competitive pressure to lower the prices of Tyco's sharps containers. Therefore, according to Plaintiffs, the price of Tyco's sharps containers was artificially inflated as compared to the price of Tyco's sharps containers in the "but-for world"—that is, the competitive price for Tyco's sharps containers that would have existed "but-for" Tyco's scheme. (*See* Compl. ¶ 77; Elhauge Decl. ¶¶ 15, 48–49). Plaintiffs allege that they sustained damages from Tyco's scheme in the form of the overcharges they paid in purchasing Tyco's sharps containers at the "artificially inflated" price, the "overcharges" understood as the difference between the price of sharps containers resulting from Tyco's scheme and the price of the containers in the "but-for" world. (*See* Compl. ¶ 78).

## C. THE CLASS REPRESENTATIVES

### 1. *Natchitoches*

Proposed class representative Natchitoches, a direct purchaser of Tyco's sharps containers, is a 199–bed hospital and nursing home facility located in Natchitoches, Louisiana. Natchitoches began purchasing its sharps containers from Tyco in 1999 after becoming dissatisfied with sharps containers it purchased from Becton Dickinson. It is a member of GPOs MedAssets, Amerinet, and Novation. Natchitoches has not evaluated or purchased any reusable sharps containers.

Prior to the filing of the Complaint, Mark Marley, CEO of Natchitoches, had a general belief that there may be overcharges in the sharps containers market due to GPO contracting. He also reviewed and edited the Complaint prior to filing, and briefed the board of directors of Natchitoches on the Complaint.

### 2. *Smith Drug*

Proposed class representative Smith Drug, a direct purchaser of Tyco's sharps containers, is a distributor of medical supplies and products, with a similar product mix and customer base as larger distributors McKesson and Cardinal, but not Owens & Minor. Smith Drug has annual revenues of approximately $2 billion.

Smith Drug purchased approximately $32,000 worth of sharps containers in 2006, or approximately 0.002% of its total revenue. Sharps containers are also a small percentage of the total revenues for Cardinal, McKesson, and Owens & Minor. Smith Drug does not utilize cost-plus arrangements in which the distributor charges a percentage mark-up to customers. Instead, Smith Drug sells Tyco sharps containers at cost and is compensated by receiving prompt pay discounts from Tyco that are based upon the purchase price. Approximately 25% of Smith Drug's sharps containers customers are hospitals and 50% are independent pharmacies. Smith Drug does not have any relationships with any reusable sharps container suppliers.

Smith Drug's corporate designee, Dr. William L. Brice, has read the Complaint in this action and concluded that "there was a very distinct possibility that there were [over] charges made to Smith Drug Company in the case of Sharps Containers; we were anxious to pursue that." (Tamoshunas Suppl. Reply Decl. Ex. A., Brice Depo. at 228).

## III. DISCUSSION

Plaintiffs move for class certification under Fed.R.Civ.P. 23(a) and (b)(3). Tyco contends that the court should not certify the class for two principal reasons.

First, Tyco relies upon the Eleventh Circuit's decision in *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir.2003), to argue that a fundamental conflict exists between (1) distributor class members who, on net, have an economic stake in perpetuating Tyco's allegedly unlawful scheme, and (2) others that were harmed by the scheme. In Tyco's view, the proposed class representatives cannot overcome this fundamental conflict to adequately represent the class, as required under Rule 23(a)(4).

Second, Tyco argues that the Plaintiffs have provided no viable method for proving an antitrust violation and injury on a class-wide basis, and thus fail to satisfy the requirement under Rule 23(b)(3) that issues common to the class predominate.

### A. PLAINTIFFS' CLAIMS

Plaintiffs claim that Tyco's allegedly anticompetitive conduct violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. Plaintiffs seek to recover overcharges under Section 4 of the Clayton Act, 15 U.S.C. § 15, which allows persons "injured" by violations of federal antitrust law to "recover threefold the damages ... sustained," as well as the costs in bringing suit.

#### 1. Section 2 of the Sherman Act (Count I)

Plaintiffs claim that Tyco violated Section 2 of the Sherman Act because Tyco's scheme to foreclose the sharps containers market was an unlawful exercise of its monopoly power to maintain and increase its monopoly in the sharps containers market. (Compl.¶¶ 79–84).

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. Despite its sweeping language, to recover under Section 2, a plaintiff must prove that "(1) the defendant has monopoly power and (2) the defen-

dant 'has engaged in impermissible "exclusionary" practices with the design or effect of protecting or enhancing its monopoly position.' " *CCBN.com, Inc. v. Thomson Fin., Inc.*, 270 F.Supp.2d 146, 156 (D.Mass.2003) (citing *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 195–96 (1st Cir.1996)); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) ("[T]he possession of monopoly power will not be found unlawful [under Section 2] unless it is accompanied by an element of anticompetitive *conduct*.").

Courts have recognized Section 2 claims based upon exclusionary conduct similar to the allegations in this complaint. *See, e.g., LePage's Inc. v. 3M*, 324 F.3d 141, 154–60 (3d Cir.2003) (upholding jury verdict that found that defendant 3M's scheme of (1) bundling its rebates with other 3M products and (2) entering into exclusive dealing contracts with large customers to foreclose the transparent tape market violated Section 2).

#### 2. Section 1 of the Sherman Act (Count II)

Plaintiffs claim that Tyco violated Section 1 of the Sherman Act by conspiring and entering into agreements with GPOs and other manufacturers to unlawfully maintain and increase its monopoly power in the sharps containers market. (Compl.¶¶ 85–91). Plaintiffs do not contend that these agreements are per se illegal under Section 1.

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To succeed on a claim under Section 1 of the Sherman Act, a plaintiff must prove "(1) the existence of a contract, combination, or conspiracy (2) that unreasonably restrains trade either per se or under the rule of reason and (3) that effects interstate trade or commerce." *In re Carbon Black Antitrust Litig.*, No. 03–10191, 2005 WL 102966, at *5 (D.Mass. Jan.18, 2005) (citing *Lee v. Life Ins. Co. of N. Am.*, 829 F.Supp. 529, 535 (D.R.I.1993), *aff'd*, 23 F.3d 14 (1st Cir.1994)).

Courts have recognized Section 1 claims based upon similar exclusionary contracts. *See, e.g., Masimo v. Tyco Health Care Group, L.P.*, No. 02–4770, 2006 WL 1236666, at *7–10 (C.D.Cal. Mar.22, 2006) (sustaining jury verdict against Tyco that found, among other things, a Section 1 violation based upon sole-source contracts with GPOs in the oximetry market).

## B. RULE 23 STANDARD[2]

Under Rule 23(a), a class may be certified only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representatives will fairly and adequately protect the interests of the class.

Plaintiffs further seek damages under Rule 23(b)(3), which provides that an action may be maintained only if, additionally,

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to the findings include:

(A) the class members' interest in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

■ A district court must determine whether a proposed class meets the exacting prerequisites established by Rule 23. *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32,

38 (1st Cir.2003). In "determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir.2000) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). However, "a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Mowbray*, 208 F.3d at 298; *see also Tardiff v. Knox County*, 365 F.3d 1, 4–5 (1st Cir.2004) ("It is sometimes taken for granted that the complaint's allegations are necessarily controlling; but class action machinery is expensive and in our view a court has the power to test disputed premises early on if and when the class action would be proper on one premise but not another."). Plaintiffs bear the burden of demonstrating that the Rule's prerequisites have been satisfied. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–15, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Smilow*, 323 F.3d at 38.

### 1. *Numerosity*

■ Plaintiffs allege that the class "is composed of over 1,500 members." Tyco concedes that "[t]here's no doubt that there's numerosity" as to the class. (Sept. Tr. at 45). Given the low threshold for numerosity, Plaintiffs easily meet this prong of Rule 23. *See, e.g., Holton v. Rothschild*, 118 F.R.D. 280, 282 (D.Mass.1987) (holding that a class of 50 or 60 is sufficiently large).

### 2. *Commonality*

Under Rule 23(a)(2), a class has sufficient commonality "if there are questions of law or fact common to the class." The threshold of commonality is easily penetrated. "[T]he rule requires only that resolution of the common questions affect all or a substantial number of the class members." *Jenkins v. Ray-*

---

2. Effective December 1, 2007, the language of Rule 23 was amended "to make style and terminology consistent throughout the rules. *These changes are intended to be stylistic only.*" Fed.

R.Civ.P. 23 advisory committee's note 2007 Amendment (emphasis added). For the sake of clarity, the Court will cite to the amended language.

*mark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986) (citation omitted). "The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative; that is, there need be only a *single issue common* to all members of the class. Therefore, this requirement is easily met in most cases." 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.10 (4th ed.2002) (emphasis added). In the antitrust context "courts have held that the existence of an alleged conspiracy or monopoly is a common issue that will satisfy the Rule 23(a)(2) prerequisite." *Id.* (citing cases).

■ Plaintiffs readily meet the commonality requirement, as Plaintiffs identify a number of issues related to whether a violation of the antitrust laws occurred that are common to the proposed class:

· whether Tyco obtained, maintained, and/or possessed market and/or monopoly power in the market for Sharps Containers in the United States during the Class Period;

· whether Tyco obtained and/or maintained its market and/or monopoly power through willful, anticompetitive and/or unlawful activity;

· whether Tyco engaged in illegal agreements, contracts, combinations, and/or conspiracies, the purpose and effect of which was to unreasonably restrain competition in the Sharps Containers market; [and]

· whether Tyco's sole-source contracts with GPOs, as part of its overall scheme to monopolize, are unreasonable restraints on trade and competition in violation of the federal antitrust laws.

(Pl. Mem. at 23–24).

### 3. *Typicality*

Rule 23(a)(3) provides that a class action may be maintained only if the claims of the representative parties are typical of the claims of the class.

Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996) (quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.13 (3d ed.1992)). "The typicality requirement 'is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals.'" *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 531 (3d Cir.2004) (citation omitted). "[T]ypicality, as with commonality, does not require 'that all putative class members share identical claims.'" *Id.* at 531–32 (citation omitted).

Plaintiffs have proposed Natchitoches, a hospital end user of sharps containers, and Smith Drug, a distributor, as representatives for the direct purchaser class. Both have purchased sharps containers from Tyco during the relevant class period. Moreover, Plaintiffs contend that the class representatives' claims, like the claims of the other class members, all "arise out of a common wrong: a core pattern of alleged anticompetitive conduct that would have similarly injured each of them by artificially inflating the price of Tyco's Sharps Containers." (Pl. Mem. at 18). The Court finds this sufficient to establish typicality. *See In re Relafen Antitrust Litig.,* 218 F.R.D. 337, 342–43 (D.Mass.2003) (typicality established in antitrust action where "claims arise from the same course of conduct that gave rise to the claims of the absent [class] members.") (citations and internal quotations omitted).

Tyco argues separately that Smith Drug is not typical of the distributors in the class because (1) Smith Drug does not have the same cost-plus arrangements as other distributors in the class and (2) it primarily sells sharps containers to pharmacies rather than end users. Thus, Tyco contends that Smith Drug is not at risk of being by-passed by reusable sharps containers. Tyco styles this

objection as one of the "adequacy" of Smith Drug, but these specific objections relate to typicality. *See Rental Car of N.H., Inc. v. Westinghouse Elec. Corp.*, 496 F.Supp. 373, 377 (D.Mass.1980) (in price-fixing case, noting that courts have equated typicality requirement with adequacy of representation requirement, citing cases).

■ The Court finds otherwise. Smith Drug is compensated by receiving prompt pay discounts from Tyco that are based upon a percentage of the purchase price, and thus is paid, like distributors with cost-plus arrangements, on a percentage basis. In addition, since Smith Drug sold approximately 25% of its sharps containers to end user hospitals, Smith Drug was also at risk of losing business from reusable sharps containers that would by-pass Smith Drug. Significantly, Tyco had the opportunity to take class discovery, but presented no evidence to the Court as to whether Smith Drug received a net economic benefit or harm from Tyco's allegedly unlawful scheme. While there are differences between Smith Drug and the other distributors in the class, they are not sufficient to destroy typicality.

### 4. *Adequacy of Representation*

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231.

> The [adequacy] rule has two parts. The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation.

*Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985). "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir.2001), *overruled on other grounds by In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir.2006) (internal quotations and citations omitted).

■ As an initial matter, Tyco argues that the proposed class representatives cannot adequately represent the class because of their "limited personal knowledge of the facts underlying this suit, as well as their apparently superfluous role in this litigation." *In re Sepracor, Inc., Sec. Litig.*, 233 F.R.D. 52, 55 (D.Mass.2005) (quoting *Greenspan v. Brassler*, 78 F.R.D. 130, 133–34 (S.D.N.Y.1978)). However, a class representative in an antitrust action only needs a "working knowledge" of the action. *See J.B.D.L. Corp. v. Wyeth–Ayerst Labs., Inc.*, 225 F.R.D. 208, 216–17 (S.D.Ohio 2003) (in antitrust action, finding that class representative had sufficient knowledge despite memory lapse). Moreover, in the context of antitrust, a plaintiff is not required to understand complex economic theories or have an expert's knowledge of the market. *Morelock Enters. v. Weyerhaeuser Co.*, No. 04–583, 2004 WL 2997526, at *4 (D.Or. Dec.16, 2004); *see also In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 69 (D.Mass.2005) ("In complex actions such as this one, named plaintiffs are not required to have expert knowledge of all of the details of the case."). Both Natchitoches, through its CEO Mark Marley, and Smith Drug, through its corporate designee Dr. William L. Brice, have demonstrated a working knowledge of the case by reading the Complaint and understanding the basic claims of the case. No more is required.

Tyco also contends that the interests of some large distributors conflict with end user class members because some of them enter into sole- and dual-source contracts with GPOs, which are similar to (though not the same as) the sole- and dual-source contracts challenged here. Plaintiffs disagree, arguing that there is no evidence that any distributor has monopoly power, that the market for distributors is competitive, or that existing distributor/GPO contracts are not exclusionary. Plaintiffs, moreover, do not allege that the exclusionary GPO contracts at issue in this case are per se illegal. As the case progresses, different litigation positions on this liability issue might surface and require subclassing. At this stage, however, there is no evidence of a fundamental conflict.

Tyco primarily argues that the proposed class representatives cannot adequately represent the class because the class contains a fundamental conflict between (1) distributors who received a net economic benefit from Tyco's allegedly anticompetitive scheme and (2) others, such as end user hospitals, who were harmed by the scheme.

Tyco identifies two ways in which distributors benefitted from Tyco's scheme. First, Tyco argues that distributors, in particular the three largest distributors of Tyco's disposable sharps containers—McKesson, Owens & Minor, and Cardinal—sold Tyco's sharps containers on a "cost-plus" basis, and thus may have received larger profits due to Tyco's allegedly higher prices. Second, Tyco argues that the chief rivals to Tyco's disposable sharps containers, providers of reusable sharps containers, "by-pass" distributors altogether, and thus distributors like McKesson, Owens & Minor, and Cardinal may receive a net economic harm should Tyco's allegedly anticompetitive scheme cease. Therefore, on net, some distributors in the class may have benefitted from Tyco's scheme.

Because of what can be called the "cost-plus" and the "by-pass" theories of net economic benefit, Tyco argues that the existence in the class of distributors that received a net economic benefit from Tyco's scheme creates a "fundamental conflict" among class members such that the class representatives

would not be able to vigorously prosecute the action. Consequently, the argue, both class representatives and class counsel cannot adequately represent the class as required under Rule 23(a)(4).

Tyco pins its hopes on *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir.2003), in which the Eleventh Circuit vacated and remanded the allowance of class certification because of substantially similar, though not identical, conflicts. Courts have been divided on its persuasiveness.[3] Because it is directly on point, the Court discusses *Valley Drug* separately.

After an analysis and application of *Valley Drug* to the facts of this case, the Court does not find conclusive evidence of a fundamental conflict. Accordingly, the Court finds that the class representatives can adequately represent the proposed class as required under Rule 23(a)(4).

### i. *Valley Drug*

*Valley Drug* concerned defendant Abbott Laboratories ("Abbott") and its patent for the drug terazosin hydrochloride, marketed under the brand name "Hytrin." *Valley Drug*, 350 F.3d at 1183–84. Co-defendants Geneva Pharmaceuticals ("Geneva") and Zenith Goldline Pharmaceuticals ("Zenith"), manufacturers of generic versions of Hytrin, both challenged Abbott's patent, and litigation ensued. *Id.* at 1185. Abbott eventually entered into separate settlement agreements

---

3. Some courts have found *Valley Drug's* "reasoning persuasive." *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 270 (D.Mass.2004) (citing prior order that followed *Valley Drug* and excluded from indirect purchaser end payor class those that "suffered no economic harm."); *see also Grimes v. Fairfield Resorts, Inc.*, No. 06–14363, 2007 WL 245128, at *2–3 (11th Cir. Jan.30, 2007) (reaffirming *Valley Drug*); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group, L.P.*, —— F.R.D. ——, ——, 2007 WL 4698599, at *21 (C.D.Cal. Dec.21, 2007) (denying certification because of, among other things, fundamental conflict between those that suffered net benefit and those that suffered net harm, citing *Valley Drug*); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 290 (W.D.Tex.2007) (noting certification "extraordinarily difficult" if some class members benefitted from alleged conduct, citing *Valley Drug*); *Bert v. AK Steel Corp.*, No. 02–467, 2007 WL 184746, at *3 (S.D.Ohio Jan.19, 2007) (citing *Valley Drug* with approval); *Boca Raton Cmty. Hosp., Inc. v.*

*Tenet Healthcare Corp.*, 238 F.R.D. 679, 695 (S.D.Fla.2006) (quoting *Valley Drug* for proposition that a class cannot be certified if it contains "members who benefit" from alleged unlawful acts); *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 461–63 (D.Kan.2006) (following *Valley Drug* in discovery dispute).

Other courts have criticized *Valley Drug*. See, e.g., *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303–05 (D.D.C.2007) (noting that the holding in *Valley Drug* "fails to appreciate the true import of the *Hanover Shoe* rule"); *In re K–Dur Antitrust Litig.*, No. 01–1652, Slip Op. at 22–23 & n. 12 (D.N.J. Jan. 2, 2007) (special master report denying downstream discovery, criticizing *Valley Drug*); *In re Hypodermic Prods. Direct Purchaser Antitrust Litig.*, MDL No. 1730, 2006 U.S. Dist. Lexis 89353, at *16 (D.N.J. Sept. 7, 2006) (citing with approval magistrate judge ruling that *Valley Drug's* "narrow reading of *Hanover Shoe* is neither shared by this Court nor this circuit.").

with Geneva and Zenith that delayed the entry of their generic versions of Hytrin. *Id.* at 1186. The settlement agreements were terminated in response to an investigation by the Federal Trade Commission. *Id.* The plaintiffs, regional wholesalers that purchased Hytrin directly from Abbott while the settlement agreements were in effect, brought suit alleging that the settlement agreements, in delaying entry of the generic versions of Hytrin, constituted per se violations of Section 1 of the Sherman Act. *Id.*

The plaintiffs thereafter moved for class certification on behalf of all direct purchasers of Hytrin from Abbott during the period when the settlement agreements were in effect. *Id.* The proposed class comprised both end user purchasers of Hytrin and wholesalers who, like the distributors here, resold Hytrin to end users. In fact, three national wholesalers—McKesson, Cardinal, and Bergen–Brunswig—accounted for 50% of all Hytrin direct purchases. *See id.* at 1190 & n. 18. The district court certified the class, and the defendants appealed.

On appeal, the defendants argued, among other things, that "the district court erred by foreclosing discovery on the question whether some class members benefitted from the conduct alleged to have harmed the class members on the whole." *Id.* at 1187. The *Valley Drug* court agreed, holding that the district court abused its discretion in failing to address whether adequacy of representation could be satisfied despite the fact that the most significant members of the certified class "arguably make more money on the sale of the branded product than on the generic product." *Id.* at 1191.

As in this case, the defendants argued that the wholesalers in *Valley Drug* benefitted on net from Abbott's monopoly on Hytrin by the same "cost-plus" and "by-pass" theories. Wholesalers sold drugs on a "cost-plus" basis, and thus received higher revenues from selling the branded Hytrin over the much cheaper generic alternatives. *Id.* at 1190–91. The Eleventh Circuit emphasized, however, that this fact alone is "insufficient to prove net economic benefit if it were not for the specific nature of the product and the industry involved in this case." *Id.* at 1191. In particular, the Court noted that demand for terazosin hydrochloride was "inelastic," such

that a drop in the price of the drug could not be offset by an increase volume of sales. *Id.* Any drop in price, defendants argued, would result in a net loss for wholesalers. Moreover, the defendants presented evidence that purchasers of terazosin hydrochloride, in particular retail pharmacies, "bypassed" wholesalers "for many generic sales." *Id.* Thus, wholesalers would lose even further volume from a switch from branded to generic terazosin hydrochloride.

The plaintiffs provided *no* evidence to rebut the evidence of "cost-plus" and "by-pass" provided by the defendants. *Id.* at 1190, 1196. Instead, the plaintiffs argued that allowing discovery of the wholesalers' sales practices (so-called "downstream discovery") would contravene *Hanover Shoe* and *Illinois Brick*, which forbid such downstream discovery since it is irrelevant to whether a direct purchaser has standing. *Id.* at 1192.

The Eleventh Circuit rejected the argument, reading *Hanover Shoe* as only applying to a direct purchaser's standing and damages, and not limiting the requirement that a court must determine whether Rule 23(a)(4) has been satisfied. *Id.* at 1193. Moreover, the Eleventh Circuit concluded that such an inquiry did not dull the law enforcement objectives of the *Hanover Shoe* rule, and that the limited downstream discovery for such an inquiry would not be "unduly burdensome" to plaintiffs. *Id.* at 1195–96. Accordingly, the Court vacated the grant of class certification and remanded the case to the district court. *Id.* at 1196.

The parties in *Valley Drug* ultimately settled, and moved for a single settlement class. In approving the settlement, the Court found the "fact of settlement" a "changed circumstance that directly addresses the Court's prior concern that led to denial of the Sherman Act Plaintiffs' motion for class certification." *See In re Terazosin Hydrochloride Antitrust Litig.,* Case No. 99–MDL–1317, Slip. Op. at 6 (S.D.Fla. Mar. 18, 2005) (order granting certification of direct purchaser class).

### ii. Application of *Valley Drug*

Based on *Valley Drug*, this Court permitted downstream discovery to determine

whether a fundamental conflict exists between distributor class members and end user class members. The parties took additional discovery of Cardinal, Owens & Minor, and McKesson. In response to the Court's concerns, Plaintiffs added Smith Drug as a distributor class representative.[4] Thus, as compared to the court in *Valley Drug,* this Court has a fuller record of the purported conflicts in this case.

To counter the "cost-plus" theory of net benefit, Plaintiffs argue that any overcharge recovered in this case would far outweigh any net loss from the termination of Tyco's scheme. Plaintiffs rely on the deposition of Tyco's expert Prof. Janusz Ordover, who, based upon plausible assumptions provided by the Plaintiffs, estimates that the potential overcharge recoverable could be approximately 45–75 times any potential net benefit from Tyco's scheme. (*See* Cebulash Decl. Ex. N, Ordover Dep. at 101–06). Plaintiffs also show, based on other evidence in the record, that the potential recovery could be several times any potential loss due to the enjoining of Tyco's allegedly unlawful scheme. (*See* Pl. Suppl. Mem. at 12–14).

To rebut the "by-pass" theory of net benefit, Plaintiffs present evidence that reusable sharps containers do not necessarily by-pass distributors. Plaintiffs point to an agreement entered into between Cardinal and Daniels to serve as marketing, sales, and billing agent for the Daniels Sharpsmart System. Plaintiffs also point out that Tyco has explored a relationship with Owens & Minor to provide distribution services for Tyco's StarServe program, Tyco's entry into the reusable sharps containers market. (Tamoshunas Suppl. Decl. Ex. H at TYN0146246). To be sure, Tyco has presented some evidence that the Cardinal and Daniels agreement has been disappointing. (Steiner Suppl. Decl. Ex. X at DI_00437288). Still, this evidence demonstrates that distributors will not stand idly by while reusable sharps containers enter the market, but will nimbly try to adjust.

The Court finds this evidence persuasive in demonstrating that a fundamental conflict

does not exist in this case at least with respect to liability issues because distributors are likely to gain an economic net benefit from the litigation. Plaintiffs presented evidence that distributors have explored opportunities to participate in the reusable market in an attempt to offset any potential losses from a by-pass. Plus, any potential loss in distributor revenue could be significantly outweighed by the potential treble damages that the distributors could collect should the Court find Tyco liable. This is particularly true given the specific nature of the product and industry in this case, where the evidence has shown that sharps containers constitute only a small percentage of the total revenues of Cardinal, Owens & Minor, and McKesson.

Moreover, there are similar cases where distributors/wholesalers happily participated in settlement classes with end user direct purchasers. *See, e.g., In re Relafen Antitrust Litig.,* No. 01–12239 (D.Mass. Apr. 9, 2004) (order and final judgment certifying settlement class of all direct purchasers). In fact, the very fundamental conflict that destroyed certification in *Valley Drug* was overcome at the settlement stage.

Despite this evidence, Tyco vigorously contends that a fundamental conflict exists. The Court, in fact, permitted downstream discovery to enable the parties to find out whether Cardinal, Owens & Minor, and McKesson have a conflict or object to this suit. Tyco provided no such evidence. While the distributors and end users do not have identical economic interests in the market, there is no evidence in this record of a fundamental conflict in this litigation.

In any event, should *any* fundamental conflict arise, a ready mechanism exists to protect it—the opt-out provision. The opt-out provision in Rule 23(c)(2)(B) "is an important method for determining whether alleged conflicts are real or speculative. It avoids class certification denial for conflicts that are merely conjectural and, if conflicts do exist, resolves them by allowing dissident class members to exclude themselves from the ac-

---

4. Plaintiffs did not move to amend their Complaint before adding Smith Drug as a class representative pursuant to Fed.R.Civ.P. 15(c). However, because Plaintiffs did so at the suggestion of the Court, and because Tyco does not object that Smith Drug was not properly added, the Court will treat Smith Drug as a proper class representative.

tion." 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.30 (4th ed.2002); *see also Smilow*, 323 F.3d at 43 (because opt-out was an option, "hypothetical conflict provides no basis for decertification."). Sophisticated players such as distributors and large hospitals can determine for themselves whether a fundamental conflict exists within the class. Moreover, in the event of a settlement, the Court can offer a new opportunity for class members to request exclusion pursuant to Fed.R.Civ.P. 23(e)(4).

■ In addition, the Court has the right to require subclassing if fundamental conflicts do in fact arise. Fed.R.Civ.P. 23(c)(5) provides that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." "Subclasses must be created when differences in the positions of class members require separate representatives and separate counsel." *Manual for Complex Litigation* (Fourth) § 21.23 (2004). Subclasses can be created after an initial grant of class certification. *See* Fed.R.Civ.P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment").

Another role of subclassing would be to provide structural guaranties that a proposed settlement is fair. *See* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.31 (4th ed. 2002) ("When the class members are united in interest on the liability issues but have potential conflicts regarding the nature of the relief or the division of a monetary award, the court may avoid the potential conflict by creating subclasses"); *cf. In re Relafen*, 221 F.R.D. at 270 n. 8 ("With respect to settlement ... an uninjured end payor might be willing to accept a far lesser sum than would an injured end payor with an entirely different economic situation."). For example, there might be a question as to how to allocate a settlement fund between end users and distributors.[5] In this event, a subclass could be readily provided because Smith Drug has been added as a class representative, and separate counsel could be appointed for the subclass.

At this stage, though, the Court concludes that the wiser course is to defer any subclassing unless and until fundamental conflicts in fact arise in this case. *See In re Visa Check/MasterMoney*, 280 F.3d at 145 (in determining adequacy of representation under Rule 23(a)(4), noting that "[i]n the event that the district court does find conflicts [as to damage calculation] ... there are a variety of devices available to resolve the problem [including] the possibilities of ... creating subclasses."). At least one court has suggested pre-emptive subclassing as a way to forestall any conflicts. *See, e.g., In re Warfarin*, 391 F.3d at 532 & n. 14 (3d Cir. 2004) (suggesting subclasses to forestall "conflicts," but finding that subclasses not needed in settlement since "[a]ppellants have only asserted, rather than established, an inherent conflict among consumers and between consumers and TPPs"). Still, "[s]ubclassing should not be resorted to unless it serves a necessary purpose since it adds to the cost and complexity of a class action." *Schwab v. Philip Morris USA, Inc.*, 449 F.Supp.2d 992, 1105 (E.D.N.Y.2006).

### 5. *Predominance*

"Predominance is a test readily met in certain cases alleging violations of the antitrust laws." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231 (citations omitted). In antitrust cases, "common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues." 6 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.25 (4th ed.2002) (citing cases). "Even where there are some individualized damages issues," common issues may predominate "when liability can be determined on a classwide basis." *In re Visa Check/MasterMoney*, 280 F.3d at 139; *see also Smilow*, 323 F.3d at 40 (noting that "where ... common questions predominate regarding liability, then courts generally find the predominance requirement satisfied even if individual damage issues remain," citing *In re Visa Check/MasterMoney*). Thus, for purposes of this motion the Court focuses on the Plain-

---

**5.** Indeed, in the multi-district litigation this Court has handled, separate counsel represented the consumers and the third-party payors during mediation to ensure that the class fund was divided fairly. This approach provided assurance to the Court that the funds were fairly allocated.

270

tiffs' proposed methodologies to prove class-wide antitrust liability—that is, a classwide antitrust violation and resultant classwide injury.

To determine predominance, a court need not plunge into the weeds of an expert dispute about potential technical flaws in an expert methodology. *See Smilow,* 323 F.3d at 41 ("If later evidence disproves [the expert's proposed methods], the district court can at that stage modify or decertify the class.") "The important question in a class certification context is whether after a sneak preview of the issues, the expert approach appears fundamentally flawed—an issue usually vetted more fully at a *Daubert* hearing based on a more detailed record." *In re Pharm. Indus. Average Wholesale Price Litig.,* 230 F.R.D. 61, 90 (D.Mass.2005).

To establish predominance as to proving an antitrust violation and resulting injury, Plaintiffs rely on expert declarations submitted by Professor Einer R. Elhauge, a professor at Harvard Law School who teaches, among other things, antitrust and health care policy, co-authored the Areeda Antitrust Treatise volume on tying and other books and articles on antitrust subjects, and is an economic consultant with Criterion Economics. Although not an economist, Professor Elhauge has specific expertise on the antitrust economics of medical device suppliers' exclusionary agreements between GPOs and purchasers.

Prof. Elhauge opines that common antitrust injury "flows naturally from establishing ... five premises," proof of which would be common to all class members. (Elhauge Reply Decl. ¶¶ 3, 5). They are:

(a) **Market Definition.** It must be shown that there is an economically relevant U.S. sharps container market. For the second foreclosure theory ... it must also be shown that there is an economically relevant GPO brokerage services market.

(b) **Market Power.** It must be shown that Tyco has market power in the sharps container market.

(c) **Substantial Foreclosure.** At least one of two market foreclosure theories must be shown. The **first** theory is that Tyco used exclusionary commitment contracts with end-users (either direct or bro-kered through GPOs) to foreclose a substantial share of the sharps container market to Tyco's rivals. The **second** foreclosure theory is that Tyco used exclusionary sole or dual-source contracts with GPOs to foreclose a substantial share of the GPO brokerage services market to Tyco's rivals in the sharps container market. These market foreclosure claims are separate: the first foreclosure could exist without the second, and vice versa.

(d) **Diminished Rival Competitiveness.** One must show that at least one of the above marketwide foreclosures made Tyco's rivals in the sharps container market less competitive than they would have been without that foreclosure. If both market foreclosures are proven, one would cumulatively assess their effect on the competitiveness of Tyco's rivals.

(e) **Lack of Redeeming Efficiencies.** The exclusionary contracts causing the market foreclosure in question must not be shown to have efficiencies that (a) could not have been achieved through less anti-competitive alternatives, and (b) were passed on to consumers in sufficient magnitude to offset any anticompetitive effect on price.

(*Id.* ¶ 2). Tyco primarily, though not exclusively, focuses on the third through fifth premises, arguing that Prof. Elhauge cannot prove substantial foreclosure and a resulting injury on a classwide basis.

To prove market foreclosure, Prof. Elhauge details various methodologies that could be used for calculation of market foreclosure and for proving the share of the GPO market that was foreclosed (*Id.* ¶¶ 12–14). Specifically, to prove foreclosure by Tyco's exclusionary dealing with end users, he plans to rely on "electronic transactional data on the prices paid by each end user." (*Id.* ¶ 12 & n. 2 (relying on using Tyco's "transaction-by-transaction sales data for each year from 2001 to 2006" to "calculate foreclosure" resulting from exclusionary dealing with end user purchasers)). According to Prof. Elhauge, under this methodology, dividing the committed quantity by the total market provides the share of the container market foreclosed. (*Id.* ¶ 12). To determine foreclosure

of the GPO brokerage services market, Prof. Elhauge also proposes to review terms of contracts between Tyco and GPOs and calculate how many sales Tyco made under exclusionary contracts as compared to non-exclusionary contracts. (*Id.* ¶ 13).

To determine anti-competitive impact on rivals, Prof. Elhauge proposes, among other things, to compare how rivals actually did selling in the foreclosed part of the market compared to how they did selling in the unforeclosed part of the market, *or* to examine how rivals did selling before foreclosure happened compared to how they did afterwards. (Elhauge Reply Decl. ¶¶ 13–14 (emphasis added); *see also* Elhauge Reply Decl. ¶¶ 37–40 (proposing to "cross-check . . . foreclosure figures against other evidence to confirm the inference that any substantial foreclosure share had an anticompetitive impact on the market")). Prof. Elhauge proposes other general empirical methods to determine "the extent to which [Tyco's scheme] altered Tyco's market power and prices." (Elhauge Reply Decl. ¶ 16).

Tyco challenges Plaintiffs' expert declarations as too general and preliminary, failing to articulate a "plausible but-for world." (Ordover Decl. ¶¶ 48, 52; Ordover Sur–Reply Decl. ¶ 2). As a result, Tyco argues that Plaintiffs' expert has not established a viable method of establishing, on a classwide basis, (1) substantial foreclosure of the sharps container market and a resulting (2) classwide impact. (Ordover Sur–Reply Decl. ¶¶ 1–2).

To support their position, Tyco has submitted the expert declarations of Professor Janusz A. Ordover, a Professor of Economics and former Director of the Masters in Economics Program at New York University. Professor Ordover is a Founding Director of Competition Policy Associates, an economic consulting firm. During 1991–1992, he was the Deputy Assistant Attorney General for Economics at the Antitrust Division of the United States Department of Justice where he was the Chief Economist. His areas of specialization include industrial organization, antitrust, and regulation economics.

As to foreclosure, *Prof.* Ordover argues that the proposed methods of determining classwide injury may overstate overcharges because Plaintiffs do not have a viable meth-od of determining which buyers were coerced into buying sharps containers and which purchased sharps containers for pro-competitive reasons. (*See* Ordover Decl. ¶ 58). Prof. Ordover challenges Prof. Elhauge's core assumption that the quantities of Kendall sharps containers that were sold under the accused contracting practices (like share commitment contracts) comprise the portion of the market that has been foreclosed. He argues that "one would at a minimum examine whether healthcare customers that purchased under such contract terms were, in fact, able to secure better overall terms for sharps containers than those who did not." (Ordover Sur–Reply Decl. ¶ 3). For example, in Tyco's view, if a hospital is a member of a GPO that offers a market share discount, and the buyer obtains a significantly reduced price by buying 100% Kendall, the buyer has chosen Kendall for legitimate, pro-competitive reasons. Prof. Ordover also contends that Prof. Elhauge's foreclosure theories "fail to acknowledge active competition that exists among sharps container manufacturers to win a contract from any particular GPO and to gain sales at any hospital or other healthcare facility." (*Id.* ¶ 4).

As to classwide impact, Prof. Ordover challenges Prof. Elhauge's assertion that a common, classwide injury would result even assuming substantial foreclosure. Prof. Ordover notes a number of differences among end user class members that may suggest that the extent of antitrust damages (if any) varies among the class. Prof. Ordover, in particular, notes differences among class members such as differences among products and class member needs; the size of the end users and the availability of volume-based discounts and contracting leverage; whether class members belong to IDNs that can mitigate any overcharge; and the geographic location of the class members and the availability of reusable waste services. (Ordover Decl. ¶¶ 59–63; Ordover Sur–Reply Decl. ¶¶ 10–16). To show that these differences among class members argue against a common injury, Prof. Ordover provides the following hypothetical:

Assume that Seller (S) attempts anticompetitive exclusion of rival R(R). This requires that it denies R access to a substan-

tial portion of the available demand (as postulated by Plaintiffs here). In order to accomplish this, it offers a net price of $10 per container to several large IHNs in exchange for a 90% commitment. By assumption, R cannot beat this offer. Other purchasers pay $15 per container. Also by assumption, because exclusion is successful R cannot beat the $15 offer either. In the but-for world exclusionary contracts are not permitted. Again, by assumption, this leads to a lower average price of $12, say. Plainly, absent the exclusionary conduct, some end buyers gain while others lose. (Ordover Sur–Reply Decl. ¶ 10 n. 13). In sum, Prof. Ordover argues that even if Prof. Elhauge can prove an *average* antitrust injury, it does not follow that *each* class member suffered injury. (Ordover Decl. ¶¶ 70, 84; Ordover Sur–Reply Decl. ¶ 10); *see also Allied Orthopedic Appliances,* 247 F.R.D. 156, 164–170, 2007 WL 4698599, at *9–14 (rejecting methodology to prove common impact relying on average prices given reality of customized contracting and product differentiation in the market).

Prof. Elhauge disagrees. With respect to foreclosure, Prof. Elhauge argues, "What causes the purchaser's injury is not whether it was individually 'coerced,' but the effect the marketwide foreclosure has on Tyco's market power and market prices." (Elhauge Reply Decl. ¶ 4). He responds that as a matter of standard antitrust economics, "buyers have incentives to agree to exclusionary contracts even when they have an anticompetitive effect because most of the harm of individual agreements is *externalized* onto those who are not party to that particular agreement." (*Id.* ¶ 31) (emphasis added). He also disagrees factually, arguing there is no evidence that vigorous competition to enter into GPO sole-source and dual-source contracts actually occurred in this case. (*Id.* ¶ 32).

With respect to common injury, Prof. Elhauge argues that the differences that Prof. Ordover identifies either (1) rely "on the mistaken proposition that anticompetitive conduct would persist in the but-for world," (2) already have been considered, (3) are irrelevant, or (4) go to the merits and thus are classwide issues. (*See* Elhauge Reply

Decl. ¶¶ 19, 51–52). Prof. Elhauge gives the following hypothetical to explain his position:

Assume that the but-for price for a sharps container would be $10 absent Tyco's exclusionary conduct, but that because that conduct forecloses a substantial share of the market, the actual market price is $20. To induce purchasers to agree to its exclusionary program, Tyco has charged committed buyers 10% less than uncommitted buyers and set the uncommitted price at $20. Each buyer would have individual incentives to commit, because then it would pay $18 rather than $20. In this situation, both the committed price ($18) and the uncommitted price ($20) in the actual world are higher than the but-for price ($10). Thus, even though some class members suffer damages of $10 and other [sic] suffer damages of $8, the marketwide increase in prices caused by Tyco's anticompetitive conduct has had a common impact on both. *Professor Ordover's claim is effectively that the committed prices paid by the bulk of buyers might be less than $10.* But he offers no explanation why any rational profit-maximizing firm like Tyco would adopt a commitment program that results in lower revenue than it could have earned without the program. Moreover, this amounts to an argument that these commitment contracts efficiently lower prices. Such efficiency issues ... are fully amenable to classwide resolution. If Professor Ordover's argument on this claim is accepted on the merits, *it would mean that the commitment contracts are not antitrust violations, and thus would exist in the but-for world as well as the actual world, in which case they cannot undermine classwide assessment of impact.*

(*Id.* ¶ 68 (emphasis added); *see also* Elhauge Decl. ¶¶ 55–56).

In sum, according to Prof. Elhauge, even "[i]f the Tyco 52 containers that a particular purchaser actually bought are precisely the same containers as that purchaser would have bought in the but-for world, that purchaser would still be injured because it paid higher prices for those containers than it would have paid without the anticompetitive market foreclosure." (Elhauge Reply Decl. ¶ 4). Consequently, Plaintiffs argue that

proof of individual coercion is largely irrelevant, and any risk of overstating damages can be mitigated by the cross-checks Prof. Elhauge proposes. (*See* Elhauge Reply Decl. ¶¶ 37–40). Thus, Plaintiffs contend that regardless of the differences among purchasers as to coercion, the key to determining an antitrust violation and injury is to determine whether a substantial share of the market was foreclosed, and whether this substantial foreclosure led to increased market prices.

The class record is not sufficiently developed to resolve this robust economic debate between these two highly qualified antitrust titans with respect to the impact of the alleged exclusionary contracts on the sharps containers market. The Court is persuaded, however, that Prof. Elhauge's methodology is amenable to classwide resolution with respect to his calculation of substantial foreclosure of the market and his analysis of possible anticompetitive impact.

The preliminary nature of Prof. Elhauge's analysis, however, is troubling. He has not rendered even a preliminary opinion based on preliminary evidence that Tyco's conduct has *in fact* violated the antitrust laws and resulted in an antitrust injury. Rather, he has outlined a general methodology: maybe-I'll-try-this-or-maybe-I'll-try-that. Some courts have denied certification where the experts simply relied on a theory of "presumed impact." *See, e.g., Am. Seed Co., Inc. v. Monsanto Co.*, 238 F.R.D. 394, 400 (D.Del. 2006) (denying certification where plaintiffs' expert "cites absolutely no factual authority in his declaration in support of his theory of common injury and damages"); *In re Med. Waste Servs. Antitrust Litig.*, No. 2:03MD1546, 2006 WL 538927, at *5 (D.Utah Mar.3, 2006) (denying certification where plaintiffs' expert "impermissibly asked the court to rely on his presumption of violation and impact without any consideration of whether the markets or the alleged [conduct] at issue [t]here actually operated in such a manner so as to justify the presumption") (citation and internal quotations omitted). Here, however, Prof. Elhauge does not even

argue that there is presumed impact. Instead, Prof. Elhauge argues that *any* methodology would be classwide, even though he does not yet have an opinion as to whether there is any anticompetitive impact.

Prof. Elhauge fairly explains that he has not had the opportunity to assess full discovery on the merits and therefore has not reached any conclusions on the merits of the Plaintiffs' claims. (Elhauge Decl. ¶ 4). Prof. Elhauge proposes viable classwide methods to prove foreclosure and injury that have been admitted in similar cases. (*See* Elhauge Decl. ¶ 7; Elhauge Reply Decl. ¶ 12). As of the time of filing the briefs on class certifications, Prof. Elhauge had done an independent, though partial, review of the facts and documents in this case which formed the basis for his understanding of the sharps containers market, such as, for example, the interchangeability of reusables and disposables.

However, some of Prof. Elhauge's statements have troubled the Court. For example, he states, "Further tests can be done at the merits stage to assess issues of market definition, shares and power." (Elhauge Reply Decl. ¶ 26). These issues not only involve the merits, but will also have an impact on the definition of the class *itself.* While the common issues as outlined by the experts likely predominate over the individual issues, Prof. Elhauge has not rendered any opinion as to whether there has been a violation of the antitrust laws, or as to the appropriate definition of the foreclosed market.

As such, the Court will defer a final decision on class certification until the Court reads the final expert reports. Plaintiffs' expert report was due before Christmas, although it has not yet been submitted to the Court. It makes more sense to determine whether Plaintiffs have satisfied the predominance requirement under Rule 23(b)(3), at this later stage of the litigation—after the close of discovery and after a review of the final expert reports. If Prof. Elhauge renders a final opinion which demonstrates predominance, and it is not fundamentally flawed, the Court will certify a class.[6] The

---

6. Although the Court need not address the issue here, if the Court finds that the Plaintiffs establish predominance, the Court likely will also find that the Plaintiffs satisfy the superiority requirement of Rule 23(b)(3). Distributor class members may be reluctant to bring actions against manufacturers, and thus "a class action may be

Court emphasizes that, for purposes of this limited inquiry, the issue on class certification is not whether Plaintiffs will prevail on the merits, but whether common issues predominate.

### ORDER

The parties shall submit final briefs on class certification within two weeks of the close of expert discovery. The briefs shall be limited to 20 pages a side. Within two weeks, replies shall be filed limited to 10 pages a side. There shall be no sur-replies, additional expert submissions, or other attachments. The briefs shall be limited to the issue of predominance.

the only practical method for resolving their claims." *See In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 386 (S.D.N.Y.1996) (finding class action superior method of adjudicating case where, among other things, some class members "still depend on [the defendants] for their supply of industrial diamond products and may be hesitant to disrupt those relationships."); 6 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.41 (4th ed. 2002) ("Class actions perform an important function in cases where individual franchisees or purchasers are reluctant to sue because they fear economic reprisal," citing cases).