### In re AFTERMARKET AUTOMOTIVE LIGHTING PRODUCTS ANTITRUST LITIGATION.

#### No. 09 MDL 2007–GW(PJWx).

United States District Court, C.D. California.

July 25, 2011.

Jason S. Hartley, Bonny E. Sweeney, San Diego, CA, Jay L. Himes, New York, NY, Michael P. Lehmann, for Plaintiffs.

Thomas J. Lang, Washington, DC, Brian M. Hom, Los Angeles, CA, Matthew P. Kanny, William C. Hsu, Los Angeles, CA, Peter E. Halle, Washington, DC, for Defendants.

## PROCEEDINGS: DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (filed 09/27/10)

GEORGE H. WU, District Judge.

Before the Court is the motion of Plaintiffs DJ's Autobody, Inc.; Dynacorn Autobody Parts, Inc.; Motoring Parts International; Prevatte Auto Supply, Inc.; and Sioux Plating Co., Inc. (collectively "Plaintiffs")[1] for an Order certifying a Direct Purchaser Class ("Class") consisting of "All persons and entities that purchased Aftermarket Automotive Lighting Products ("AALPs") in the United States, and its territories and possessions, directly from a Defendant between July 15, 2001 and February 10, 2009 (the 'Class Period')." *See* Docket Item Numbers ("Doc. Nos.") 183, 194. As set forth below, the Court will grant Plaintiffs' request for class certification.

### BACKGROUND

The Defendants in this action are four sets of Taiwanese or Hong Kong companies and their United States subsidiaries: (a) TYC Brother Industrial Co. Ltd. ("TYC") and its subsidiary Genera Corporation ("Genera");
(b) Depo Auto Parts Ind. Co., Ltd. ("Depo") and its subsidiary Maxzone Vehicle Lighting Corp. ("Maxzone"); (c) Eagle Eyes Traffic Ind. Co. Ltd. ("Eagle Eyes") and its subsidiary E–Lite Automotive Inc. ("E–Lite"); and (d) Sabry Lee Limited and Sabry Lee (U.S.A.), Inc. ("Sabry Lee"), which was also partially owned by Eagle Eyes. The Complaint in this action asserts a single cause of action for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs allege that Defendants conspired to fix the prices of AALPs during the Class Period. AALPs are replacement lighting parts used in the repair of automobiles in lieu of Original Equipment Manufacturer ("OEM") lighting parts. Amended Consolidated Class Action Complaint ("ACAC") ¶ 1, Doc. No. 205.

Plaintiffs filed their motion for class certification ("Motion") and supporting documents on September 27, 2010. The Motion was accompanied by several hundred pages of supporting documents and the 306–page expert report, including exhibits, of Dr. Russell L. Lamb ("Lamb Rep."). *See* Doc. No. 195. On May 16, 2011, Defendants Genera and E–Lite filed a joint opposition to the Motion, which was accompanied by a number of declarations, over one thousand pages of supporting documents, and the 36–page expert report, including exhibits, of Dr. Gary Dornan ("Dornan Rep."). *See* Doc. No. 271. Defendant Sabry Lee filed a Notice of Joinder on May 16, 2011, which it later withdrew, informing the Court that, while it continues to contest the issues of service and personal jurisdiction, it does not oppose Plaintiffs' Motion. *See* Doc. No. 292. On June 27, 2011, Plaintiffs filed their Reply, which was accompanied by hundreds of pages of additional supporting documents and a 48–page reply expert report ("Lamb Reply Rep."), including exhibits.

---

**1.** This action was originally consolidated with other cases, resulting in eight potential class representatives Two of these class representatives, Harolds Autobody and Flash Sales, Inc., are listed on the docket sheet as plaintiffs but were not mentioned in Plaintiffs' Amended Consolidated Class Action Complaint. *See* Doc. No. 205. Moreover, Defendants indicate that Nu–Parts Automotive Products, Inc., although an alleged class representative, "was never actively involved in this litigation." Opp. 4 n. 4. Three other class representatives, Prevatte Auto Supply, DJ's Autobody, and Dynacorn Auto Body Parts, have been voluntarily dismissed from the lawsuit after the filing of the class certification motion. *See* Doc. Nos. 239, 240 (dismissing Prevatte); Nos. 228, 230 (dismissing Dynacorn); and Nos. 231, 234 (dismissing DJ's Autobody).

The term "Aftermarket Automotive Lighting Products," as defined in the Complaint, includes such products as headlamps and bulbs, parking, tail and interior lights, spot lights, fog lights and auxiliary rights sold as aftermarket replacements for the OEM parts originally contained in a vehicle. In order to be effective, an AALP must conform to the specifications of the original part. To facilitate conformity, firms involved in the manufacture, distribution and sales of AALPs instituted a universal parts numbering system known as "PartsLink." Lamb Rep. ¶ 13. Defendants all use such numbers so that their AALPs can be identified as replacements for use in specific makes, models and years of vehicles. *Id.* at ¶ 14. Since 2002, AALPs have also been certified by the Certified Automotive Parts Association ("CAPA"). *Id.* at ¶ 15.

From 2002 through 2008, Plaintiffs allege that Defendants TYC, Depo, and Eagle Eyes routinely exchanged pricing information and set prices together. Defendants' products constitute 90% of AALPs sold in the United States and, "as a consequence, their Distributor Defendant affiliates also control the vast majority (over 90%) of the Aftermarket Automotive Lighting Product market in the United States." CAC ¶ 35; *see* Lamb Rep. ¶ 9(c), 38–44. After Plaintiffs filed their initial cases, the United States Department of Justice ("DOJ") intervened to separately investigate the alleged conspiracy. Since Plaintiffs' initial class certification motion was filed, the DOJ has indicted and obtained guilty pleas from executives of Depo/Maxzone and Eagle Eyes' United States distributor. *United States v. Chen*, No. CR11–0166 (N.D.Cal.); *United States v. Hsu*, No. CR11–0061 (N.D.Cal.).

## LEGAL STANDARD

Rule 23 provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court. *See Armstrong v. Davis*, 275 F.3d 849, 872 n. 28 (9th Cir.2001). Before certifying a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996). The proponent of the class bears the burden of demonstrating that class certification is appropriate. *In re N.D. Cal., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 854 (9th Cir.1982). The party seeking certification must satisfy all requirements of Rule 23(a) and one of the subsections of Rule 23(b). *Valentino*, 97 F.3d at 1234. Rule 23(a) requires that the party seeking certification show:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

A class may be certified under Rule 23(b) where: (1) there is a risk of inconsistent of unfair adjudication; (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, making injunctive or declaratory relief appropriate as to the class as a whole; or (3) questions of law or fact common to members of the class predominate and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

In determining whether a plaintiff has met his burden of demonstrating that each element of Rule 23 has been satisfied, the court generally does not consider the merits of plaintiff's claims. *See Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 152 (N.D.Cal.1991). Rather, the court must take the substantive allegations of the complaint as true. *See Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir.1975). Nevertheless, as the Supreme Court has noted:

Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recog-

nized in [*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157–158, n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)] that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," 457 U.S., at 160, 102 S.Ct. 2364, 72 L.Ed.2d 740, and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," *id.*, at 161, 102 S.Ct. 2364, 72 L.Ed.2d 740; *see id.*, at 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 ("[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable"). Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. " '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *Falcon, supra*, at 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); some internal quotation marks omitted). Nor is there anything unusual about that consequence: The necessity of touching aspects of the merits in order to resolve preliminary matters, e.g., jurisdiction and venue, is a familiar feature of litigation. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676–677 (C.A.7 2001) (Easterbrook, J.).

*Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, ———–——, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374, 390–91 (2011).[2]

## ANALYSIS

█ The essential elements of Plaintiffs' antitrust claim are: (1) violation of antitrust law; (2) injury—or "impact"—resulting from that violation; and (3) measurable damages. 15 U.S.C. § 15; *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). The primary dispute regarding the present motion for class certification centers around the "commonality" requirement of Rule 23(a)(2) and, specifically, whether proof of impact and damages resulting from the alleged conspiracy can be presented on a class-wide basis.

A class may not be certified unless the question whether the class paid artificially inflated prices as a result of Defendants' alleged conspiracy to fix prices is amenable to common proof. *See e.g., In re Flash Memory Antitrust Litig.*, 2010 WL 2332081 *7, 2010 U.S. Dist. LEXIS 59491 *44 (N.D.Cal. June 9, 2010). As noted in *State v. Infineon Techs. AG*, 2008 WL 4155665, 2008 U.S. Dist. LEXIS 81251 (N.D.Cal. Sept. 5, 2008), cases involving horizontal price-fixing are, as a practical matter, often certified. *See id.* at *5–6, 2008 U.S. Dist. LEXIS 81251 at *26 (citing *Paper Sys., Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 612 (E.D.Wis.2000); *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 595 (N.D.Fla.1998)). "However, this does not hold true when injury or impact can be shown only on an individualized basis. *See, e.g., Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 424 (5th Cir.2004); *In re Indust. Diamonds Antitrust Litig.*, 167 F.R.D. 374 (S.D.N.Y.1996)." *Id; see also In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 166 (N.D.Cal.2001) (denying class certification where plaintiffs lacked colorable method of determining injury in fact on a class-wide basis); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 167, n. 12 (C.D.Cal.2007) (Pfaelzer, J.) ("Even in conspiracy cases courts have cautioned against simply presuming class-wide impact on the basis of speculative expert testimony without any consideration of whether the markets or the alleged conspiracy at issue ... actually operated in such a manner so as to justify that presumption.").

Also at issue in this motion is the question of the effect of the Supreme Court's recent

---

**2.** To the extent that Defendants read the quoted language from *Wal–Mart Stores* as requiring plaintiffs to "prove common class-wide injury even at the class certification stage," Suppl. 4:4–5, this Court disagrees. Rather, Plaintiffs must show that the claims of the class "depend upon a common contention .... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc.*, 131 S.Ct. at 2551, 180 L.Ed.2d at 389–90.

decision in *Wal–Mart Stores*. To the extent that Defendants are arguing that *Wal–Mart Stores* categorically precludes certification in this case, they overreach. The appeal in that case raised the issue of whether a nationwide class should have been certified under Rule 23(b)(2) where the plaintiffs therein attempted to demonstrate the common issue of company-wide gender discrimination chiefly through "statistical evidence about pay and promotion disparities between men and women at the company, anecdotal reports of discrimination from about 120 of Wal–Mart's female employees, and the testimony of a sociologist ... who conducted a "social framework analysis" of Wal–Mart's 'culture' and personnel practices, and concluded that the company was 'vulnerable' to gender discrimination. 131 S.Ct. at 2549, 180 L.Ed.2d at 387. The Supreme Court rejected this approach, holding that the plaintiffs were required to show either that Wal–Mart used a biased testing procedure for employee advancement or operated under a general policy of discrimination. *Id.* at 2551, 180 L.Ed.2d at 391–92. Here, by contrast, the existence of a "general policy" of price-fixing is—at least for the purpose of this motion—undisputed. The question to be resolved is, once again, whether Plaintiffs will be able to present proof of impact and damages resulting from this alleged policy on a class-wide basis. Nothing in *Wal–Mart Stores* suggests that Plaintiffs will inevitably be unable to present such evidence in this case.

### A. Can antitrust impact be proved through common evidence here?

As summarized in *In re Plastics Additives Antitrust Litigation*, 2010 WL 3431837, *4, 2010 U.S. Dist. LEXIS 90135, *14–16 (E.D.Pa. Aug. 31, 2010):

> In antitrust cases, "[p]roof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)." [Citation]. The individual injury element is also known as antitrust impact, and "to prevail on the merits, every class member must prove at

least some antitrust impact resulting from the alleged violation." [Citation]. "Impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." [Citation]. "Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact, although in order to prevail on the merits each class member must do so." [Citation]. "Instead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." [Citation]. "[T]he question at [the] class certification stage is whether, if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class." [Citation]. Accordingly, in determining whether Plaintiffs have met their burden, we must rigorously assess the "available evidence and the method or methods by which [P]laintiffs propose to use the evidence to prove impact at trial." [Citation].

In *Robinson*, the Fifth Circuit held that generalized proof of purchases at an inflated price is acceptable for purposes of showing the predominance of common issues at class certification. 387 F.3d at 422–23. *See also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5141861, 2010 U.S. Dist. LEXIS 141809 (N.D.Cal. Dec. 13, 2010). Often in cases involving negotiated transactions, as opposed to purchases based on list prices, such common proof is elusive. *See, e.g., Robinson*, 387 F.3d at 422; *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382–84 (S.D.N.Y.1996); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081 at *7–8, 2010 U.S. Dist. LEXIS 59491 at *45. Here, by contrast, where the amounts paid by class members were based on published catalogue prices, the question of impact is, at least in theory, easily susceptible to common proof.[3] Note, though, that

---

3. Defendants dispute whether Plaintiffs have established the existence of a "pricing structure" (*i.e.,* "that the prices paid by different purchasers

for the same product from a single seller, or for the same product from different sellers, tend to move together over time," Lamb Rep. ¶ 60), not-

the court in *In re Plastics Additives Antitrust Litigation*, found that the expert evidence relying on price listings, rather than "transactional data" without any empirical analysis, was too general to demonstrate class-wide impact due to price increase. 2010 WL 3431837 at *4-15, 2010 U.S. Dist. LEXIS 90135 at *17-55.

### 1. *Expert Reports*

■ In resolving the question of common impact, the expert reports are key. As noted in *Pecover v. Elec. Arts Inc.*, 2010 U.S. Dist. LEXIS 140632 (N.D.Cal. Dec. 21, 2010):

The admissibility of opinion testimony is governed by Article VII of the Federal Rules of Evidence ("FRE"). FRE 702 provides that opinions relating to "scientific, technical, or other specialized knowledge" may be admitted if they will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* The testimony may only be admitted if "(1) [it] is based on sufficient facts or data, (2) [it] is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of this case." *Id.* The court has a duty to ensure that expert testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). To this end, the trial judge must "determine whether the testimony has a 'reliable basis in the knowledge and experi-

ence of [the relevant] discipline,'" *id.* at 149 [119 S.Ct. 1167] (citing *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786) (brackets in original).

*Id.* at *4-5.

The Supreme Court has recently strongly indicated that *Daubert* should be applied to expert testimony at the certification stage of class action proceedings. *See Wal-Mart Stores*, 131 S.Ct. at 2553-54, 180 L.Ed.2d at 392 ("The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so ...") (citation omitted). Accordingly, in order to grant class certification, this Court must first determine whether it may rely on the methodology used by Plaintiffs' expert to decide whether the claims in this case are amenable to common proof.

There is no dispute between the parties in this case regarding their respective experts' qualifications to serve as expert witnesses. "Once a court finds that the proposed witness qualifies as an expert, it 'must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline. [Citation].'" *Pecover*, 2010 U.S. Dist. LEXIS 140632 at *10. As the court noted in *Pecover*, our concern is not with "what the experts say," but, rather "what basis they have for saying it." *Id.* (citing *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th Cir.1995) (on remand) ("*Daubert II*")). "[T]he test under *Daubert*

---

ing that graphs relied on by Plaintiffs' expert show that E-Lite, for example, charged "very disperse" prices to different customers for the same parts. Opp. 31:1-2. Defendants argue that "[t]he only possible explanation for such widespread price dispersion is that Eagle Eyes/E-Lite individually negotiated prices with these customers." Opp. 31:13-14.

Nevertheless, as observed by the court in *In re Dynamic Random Access Memory Antitrust Litig.*, 2006 WL 1530166, 2006 U.S. Dist. LEXIS 39841 (N.D.Cal. June 5, 2006):

In a number of price-fixing cases, courts have certified classes where plaintiffs have alleged that defendants conspired to set an artificially inflated base—or "benchmark" price—from which all other prices are triggered. *See, e.g., In re Vitamins Antitrust Litig.*, 209 F.R.D. [251] at 266 [(D.D.C. 2002)]; *In re Flat Glass Antitrust Litig.*, 191

F.R.D. [472] at 486 [(W.D.Pa.1999)]; *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 696 n. 19 (D.Minn.1995); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 696 (N.D.Ga.1991). Notably, classes were certified in these cases regardless whether some members of the class negotiated price individually, or whether—as here—differences among product type, customer class, and method of purchase existed, *See e.g., In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. at 383; *Arden Architectural Specialties v. Washington Mills Electro Minerals*, [2002 WL 31421915,] 2002 U.S. Dist. LEXIS 21506 (W.D.N.Y.2002).

*Id.* at *9, 2006 U.S. Dist. LEXIS 39841 at *47-48. Thus, even if there were instances where class members separately negotiated prices on occasion, it would not necessarily preclude class certification.

is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert II*, 43 F.3d at 1318.

While there is no definitive checklist or test, *Daubert*, 509 U.S. at 593 [113 S.Ct. 2786] courts have identified several non-exclusive and non-dispositive factors as potentially relevant to the reliability inquiry, including: (1) "whether a [method] can be (and has been) tested," (2) "whether the [method] has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the [method's] operation," (5) "a degree of acceptance" of the method within "a relevant community," *id.* at 593–94 [113 S.Ct. 2786], (6) whether the expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation," *Daubert II*, 43 F.3d at 1317, (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, [citation], (8) whether the expert has adequately accounted for obvious alternative explanations, [citation], whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho Tire*, 526 U.S. at 152 [119 S.Ct. 1167], and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give, *see id.* at 151 [119 S.Ct. 1167].

*Pecover*, 2010 U.S. Dist. LEXIS 140632 at *10 (ellipses omitted; all other alterations in original except for brackets indicating omitted citations).

Plaintiff's expert (Dr. Lamb) identifies the following seven factors in his report that support a finding of common classwide impact: (1) stable demand for AALPs arising from a mature market, (2) market dominance by Defendants, (3) lack of a competitive fringe during the proposed Class Period that could have effectively disciplined the effects of the proposed cartel, (4) the existence of a pricing structure adopted by Defendants, (5) interchangeability of AALPs, (6) barriers to entry, and (7) lack of economic substitutes for AALPs.

### 2. *Regression Analysis*

■ Dr. Lamb employs a regression analysis to demonstrate to demonstrate how overcharges attributable to the alleged conspiracy could be measured on a classwide basis by comparing pricing during and after the conspiracy period. "A regression is a statistical tool designed to express the relationship between one variable, such as price, and explanatory variables that may affect the first variable. Regression analysis can be used to isolate the effect of an alleged conspiracy on price, taking into consideration other factors that might also influence price, like cost and demand." *In re Plastics Additives Antitrust Litig.*, 2010 WL 3431837 at *15 n. 13, 2010 U.S. Dist. LEXIS 90135 at *57–58 n. 13.

In a Supplemental Brief filed July 7, 2011, Defendants seem to argue that the Supreme Court's decision in *Wal–Mart Stores* prevents Plaintiffs from being able to rely on their regression analysis to prove commonality. The crux of that argument is as follows:

As in *Wal–Mart*, Plaintiffs here proffer a regression purporting to show that—on average—prices of select products were impacted and therefore individual class members were impacted, and that the calculated average can be applied to determine injury and damages on a classwide basis. However, just as it was illogical in *Wal–Mart* to assume from a regression showing disparity in the number of men and women employed by *Wal–Mart* at the regional or national level that any particular proposed member of the class was the subject of discriminatory hiring practices, it is equally implausible to infer that an "average" of a group of selected products showing a net overcharge necessarily means that there was an overcharge for any particular product.

Suppl. 7:17–8:1. The comparison to *Wal–Mart Stores* is not compelling. In that case, the Supreme Court found that the plaintiffs' expert's statistical analysis was deficient because (1) "[i]nformation about disparities at the regional and national level does not establish the existence of disparities at individ-

ual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level," 131 S.Ct. at 2555, 180 L.Ed.2d at 393–394 (quoting *Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d 571, 637 (9th Cir.2010) (Ikuta, J., dissenting)), and (2) even assuming proof of a disparity "in all of Wal–Mart's 3,400 stores," plaintiffs had not identified any "specific employment practice" that might be responsible for it, *id.* at 2555, 180 L.Ed.2d at 394.

Even though these are obviously not the same types of deficiencies that Defendants purport to find with Plaintiffs' expert's reports in this case, this Court must still—for the reasons explained above—make a determination that the methodology employed by Plaintiffs' expert was sound.

### 3. *Purported Flaws with Plaintiffs' Expert's Analysis*

Plaintiffs assert that Defendants do not dispute four of the seven common factors identified by Dr. Lamb as supporting a finding of common classwide impact (*viz.,* stable demand, market dominance, lack of competitive fringe during the Class Period, and existence of pricing structure). This is somewhat uncharitable, as Defendants do appear to at least question Plaintiffs' assertions regarding competition and pricing structure in the strict sense. In any event, Defendants purport to point out numerous flaws in Dr. Lamb's methodology.

First, they argue that the regression analysis employed in his report fails to take into account the entry of "an aggressively growing new-competitor," *i.e.,* Vision, into the marketplace. This does not appear to be entirely accurate, as the Lamb report refers repeatedly to Vision and concludes that it was not a major competitive force during the Class Period or, presumably, thereafter. *See, e.g.,* Lamb Rep. ¶ 51 (referring to Vision's "limited influence"), 55, ¶ 79–80 (referring to effect of emergence of "two small fringe competitors"), and ¶ 92 (insufficient quality of competitive fringe's products). The Lamb report uses Defendants' pricing from March 2009 to May 2009 as a benchmark for comparing prices during the alleged conspiracy. Defendants' expert, Dr. Dornan, purports to show the impact of Vision's entry into the market to show there was no overcharge on products where Vision did not compete, as compared to a decline of 34% on prices where there was competition. Plaintiffs note, however, that Dr. Dornan testified at his deposition that he was unaware of Vision' market share and made no analysis of the AALPs it sold. The Dornan Report does not establish that Vision was a significant competitor during the benchmark period, nor otherwise undermine Dr. Lamb's use of Defendants' pricing from March 2009 to May 2009 as a benchmark.

Next, Defendants argue that Plaintiffs' regression model is "unstable and implausible" because it employs an averaging method (averaging across products) that supposedly masks the need for individualized inquiry to determine whether any particular purchaser was overcharged. In particular, Dr. Dornan asserts that it was impermissible for Plaintiffs' expert to assume that the averaged regression for the 1,724 parts he chose to analyze could be applied to the 3,800 parts he did not analyze. Dornan Rep. 15–16.

Defendants urge that Dr. Lamb's regression model is similar to methodologies that have been rejected by various courts at the certification stage. *See, e.g., In re Plastics Additives,* 2010 WL 3431837 at *4, 2010 U.S. Dist LEXIS 90135 at *56–58 ("Plaintiffs' regressions cannot serve as proof of impact common to the class members."); *Flash Memory,* 2010 WL 2332081 at *10, 2010 U.S. Dist. LEXIS 59491 at *59–60 (noting that plaintiffs' expert's analysis "fails to take into account the fact the wide range of different types of products with equally varied attributes"); *In re Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478, 494 (N.D.Cal. 2008) ("*GPU*") ("While averaging may be tolerable in some situations, the record here shows that it has in fact masked important differences between products and purchasers."). Plaintiffs argue that this case is at least distinguishable from *In re Plastics Additives,* in which the court found that plaintiffs had "done no empirical analysis of the actual effect of the price increases upon which they rely," 2010 WL 3431837 at *5, 2010 U.S. Dist. LEXIS 90135 at *19 because,

here, Dr. Lamb actually analyzed a large number of specific transactions. Moreover, there is actual evidence of a collusive price structure.

Plaintiffs further observe that courts have distinguished the ruling in *GPU* by noting that it involved highly customized products or that the expert regression analysis therein was flawed in certain basic ways. *See In re TFT–LCD Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D.Cal.2010) ("*LCD II*"). Moreover, the court in *GPU* actually certified a class of direct purchasers, 253 F.R.D. at 497–98. The decision in *Flash Memory* concerned the denial of certification of· a class of indirect purchasers.

In addition to arguing that Plaintiffs' expert's use of averaging masks the need for individualized proof, Defendants make the more general argument that the volume of different products at issue in this case and the length of the Class Period both make it less likely that antitrust impact can be established by common proof. Defendants are at least correct that the Class Period is quite long. They do not, however, cite to any specific facts that would make it necessary for Plaintiffs to conduct a separate inquiry vis-a-vis distinct time periods, although this Court may eventually require such studies.

Defendants also dispute Plaintiffs' contentions regarding product interchangeability and lack of substitutions, two points (the latter one, certainly) going more or less directly to the question of market definition. While a faulty market definition might indeed call into question Plaintiffs' ability to offer common proof of an antitrust injury (more likely, though, it is a question on the merits), Defendants have not shown that Dr. Lamb's conceptions of interchangeability and market substitutions are so flawed as to preclude class certification. As to the first point, Defendants purport to refute Plaintiffs' contention that "the quality of all of the Defendants' products was sufficiently comparable that proposed class members would have been able to base their purchasing decisions on price rather than quality." Lamb Rep. ¶ 76. In particular, they cite the testimony of two class representatives who stated that TYC products were superior in quality to Eagle Eyes and Depo, as well as testimony of other putative class members. Nevertheless, it is not clear that the fact the products compete on dimensions of quality as well as price would defeat certification. Moreover, Plaintiffs make the argument that the fact of the price-fixing agreement itself shows that the products competed. As to the second point, Defendants argue that Plaintiffs' expert incorrectly contends that there are no economic substitutes for AALPs and that both OEM and recycled/refurbished auto lights should be treated as market substitutions.[4] This contention is addressed in some detail in Dr. Lamb's Reply Report and would not preclude certification.

Finally, Defendants dispute Dr. Lamb's conclusion that the amount of "fringe competition" was too small to affect Defendants' prices. Lamb Rep. ¶ 51. As with other points raised by Defendants, even assuming some error in Dr. Lamb's analysis in this regard, it is not clear that this dispute does not simply go to the ultimate merits of Plaintiffs' case rather than the question whether certification should be granted.

### 4. Courts Need Not Chose Between Experts

Dr. Lamb's report essentially tries to demonstrate commonality as to the issues of impact and damages by considering the "but for" world unaffected by Defendants' purported collusion, asserting that a regression analysis is a standard way to do this. Defendants do not necessarily dispute this contention, they simply argue that Dr. Lamb's regression analysis is flawed. As Plaintiffs point out in their Reply, in situations where a court is confronted with two opposing expert analyses or econometric models of what the "but for" world would look like, the Court is not supposed to decide at the certification

---

4. In his initial Report, Dr. Lamb wrote, "It is my opinion that small changes in the price of aftermarket auto lights would not have an impact on the demand for either OEM or recycled/refurbished auto lights." Lamb Rept. ¶ 46. He further stated, "This means that while aftermarket auto lights might have certain *functional* substitutes, no *economic* substitutes exist for them." *Id.* (emphasis in original).

stage which expert analysis or model is better. As set forth in *In re TFT–LCD Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D.Cal. 2010) ("*LCD I* "):

> At the class certification stage, the Court's inquiry is limited to determining "whether plaintiffs have made a sufficient showing that the evidence they intend to present concerning antitrust impact will be made using generalized proof common to the class and that these common issues will predominate." *DRAM* [*In re Dynamic Random Access Memory Antitrust Litig.*], 2006 WL 1530166, at *9 [2006 U.S. Dist. LEXIS 39841]. "[O]n a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact." *In re Magnetic Audiotape Antitrust Litig.*, No. 99 CIV 1580, 2001 WL 619305, at *4 [2001 U.S. Dist. LEXIS 7303] (S.D.N.Y. June 1, 2001); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660 (7th Cir.2002) (in certified direct purchaser class case, reversing grant of summary judgment in favor of defendants and holding that expert battle over regression variables was an issue for trial: "[t]he defendants presented a competing regression analysis done by one of their economic experts, who added a couple of variables to the analysis of the plaintiffs' expert and, presto, the [key] variable ceased to be statistically significant." n15); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intern., Ltd.*, 247 F.R.D. 253, 270 (D.Mass. 2008) ("To determine predominance, a court need not plunge into the weeds of an expert dispute about potential technical flaws in an expert methodology.").

While Defendants' arguments in their initial Opposition brief are obviously better than their arguments that rely on *Wal–Mart Stores* they are, for the most part, sufficiently rebutted by the arguments in Plaintiffs' Reply papers, their expert's responsive declaration, and relevant case law. Again, Defendants do not appear to dispute that a regression analysis is a "standard" way to develop a hypothetical "but for" world as a means of analyzing the impact of Defendants' alleged collusive practices. Thus, Plaintiffs argue, Defendants have conceded that there is a way to prove or disprove Plaintiffs' claims on a classwide basis "even if their experts disagree as to the application of that methodology." Reply 11:18. Hence the Court would tentatively conclude that Dr. Lamb's report provides a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid for AALPs.

## B. Adequacy of Representation

■ In addition to their arguments against commonality, Defendants also make two arguments regarding adequacy of representation under Rule 23(a)(4). First, they contend that neither Plaintiffs Sioux Plating nor MPI are adequate because they bought most (or, in MPI's case, all) of their AALPs from Genera. Second, they contend that Sioux Plating is inadequate because it views Genera as a "preferred" vendor and is a warehouse distributor for Genera. As Plaintiffs note, however, "[i]n an antitrust price fixing case in which the class representative has alleged a broad conspiracy, courts have not required ... that the representative ha[s] purchased from all of the defendants or that he ha[s] been adversely affected by all of the means and methods by which the alleged conspiracy was implemented." *In re S. Cen. States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 418 (M.D.La.1980); *accord In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 511 (S.D.N.Y.1996). Similarly, the fact that Sioux Plating is a warehouse distributor for Genera does not render it inadequate as a class representative. *See Natchitoches Parish Hosp. Service Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 265–66 (D.Mass.2008) (claim of distributor class representative who allegedly received benefits from defendant's conduct was not at odds with interests of claims by a class that included end-users). Thus, the Court would reject Defendants' arguments that Plaintiffs cannot demonstrate adequacy of representation.

## C. Class Certification is Appropriate.

In light of the above discussion, the Court would conclude that class certification is warranted in this case. The requirements of Rule 23(a) are satisfied. First, the class is sufficiently numerous. Dr. Lamb estimates that Genera, Maxzone and E–Lite had, respectively, 406, 540 and 71 customer numbers associated with positive sales amounts in their transaction level data during the Class Period. Lamb Rep. ¶ 24. Thus, the proposed class numbers at least in the hundreds. Second, Plaintiffs have shown that there are questions of law or fact common to the class. Third, the claims of the representative plaintiffs are typical of those of the class. Although, in the above discussion of Plaintiffs' ability to demonstrate antitrust impact on a classwide basis, the requirements of commonality and typicality tend to merge, it is clear that both are satisfied. Finally, the proposed class representatives are adequate.

Certification is appropriate under Rule 23(b)(3). Plaintiffs have established that questions of law or fact common to the members of the class predominate over any questions affecting only individual members. They have also demonstrated that a class action would be a superior method of adjudication to numerous individual lawsuits. The matters pertinent to a finding that a class action is a superior method of adjudication include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1189 (9th Cir.), *on rehearing*, 273 F.3d 1266 (9th Cir.2001); *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 651 (N.D.Cal.2007).

"In antitrust cases such as this, the damages of individual direct purchasers are likely to be too small to justify litigation, but a class action would offer those with small claims the opportunity for meaningful redress. A class action is the superior method of resolving this controversy." *In re Static Random Access Antitrust Litig.*, 2008 WL 4447592, 2008 U.S. Dist. LEXIS 107523 (N.D.Cal. Sept. 29, 2008); *accord LCD I*, 267 F.R.D. at 314–315. Class certification in this case would be far superior to, and more manageable than, any other procedure available for the treatment of the factual and legal issues raised by Plaintiffs' claims.

## D. Appointment of Class Counsel

Previously, the Court appointed four counsel as Interim Counsel in these cases. Their work in prosecuting this action has been effective and efficient. These counsel would therefore be appointed as Direct Purchaser Class Counsel.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification would be granted.